**Entered on Docket**
**August 05, 2021**
**EDWARD J. EMMONS, CLERK**
**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**



The following constitutes the order of the Court.
Signed: August 5, 2021

_____

**Charles Novack**
**U.S. Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

| | |
|---|---|
| In re:<br><br>WESTERN ASBESTOS CO.,<br><br>      Debtor. | Case No. 13-31914 HLB<br><br>Chapter 11 |
| MARVIE DARDEN, individually and as successor in interest to Eddie Darden, CHRISTOPHER DARDEN, DEBORA DARDEN, LAWRENCE DARDEN, ROSALIND DARDEN KEETON, ANITA GARDYNE, ANGELA NEWSOME,<br><br>      Plaintiffs,<br>vs.<br><br>WESTERN ASBESTOS SETTLEMENT TRUST,<br>      Defendant. | Adversary No. 20-3026 CN<br><br>**MEMORANDUM DECISION DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON DECLARATORY RELIEF/ PERSONAL INJURY TRUST CLAIM, AND GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANT ON PERSONAL INJURY CLAIM** |
| SANDRA R. HERNANDEZ, Trustee Western Asbestos Settlement Trust, JOHN F. LUIKART, Trustee of Western Asbestos Settlement Trust, WESTERN ASBESTOS SETTLEMENT TRUST, Trustee of Western Asbestos Settlement Trust<br><br>      Counter-Claimants,<br>vs.<br><br>MARVIE DARDEN, individually ans as successor in interest to Eddie Darden, CHRISTOPHER DARDEN, DEBORA DARDEN, LAWRENCE DARDEN, ROSALIND DARDEN KEETON, ANITA GARDYNE, ANGELA NEWSOME,<br><br>      Counter-Defendants. | |

1

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

On June 18, 2021, this court conducted a hearing on the cross motions for summary judgment filed by plaintiffs Marvie Darden, Christopher Darden, Debora Darden, Lawrence Darden, Rosalind Darden Keeton, Anita Gardyne and Angela Newsome (collectively, the "Dardens") and defendant and counter-claimant Western Asbestos Settlement Trust.[1] All appearances were noted on the record. This adversary proceeding addresses whether the Trust must consider and compensate the Dardens for the asbestos related claims they have filed or intend to file with the Trust. The Trust was created under Bankruptcy Code §524(g) to resolve tort claims arising from exposure to the asbestos-containing products distributed by Chapter 11 debtors Western Asbestos Company, Western MacArthur Company, and MacArthur Company. Since it began its work in 2004, the Trust has resolved thousands of claims without bankruptcy court intervention. The Dardens and the Trust now seek, however, declaratory relief to determine, *inter alia*, whether the Trust must administer the personal injury claim filed by Edward Darden in June 2017 and any wrongful death claim that the Dardens may file.[2] Given the distinct nature of these claims, the court will address the June 2017 claim and wrongful death claims separately. This memorandum decision addresses the June 2017 claim.

The summary judgment standard under Federal Rule of Bankruptcy Procedure 7056 is well established. A party is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The trial court does not weigh the evidence but merely determines whether material facts remain in dispute. This court must also draw all reasonable inferences in favor of the non-moving party. A dispute is

---

[1] The Trust is appearing through its trustees - Sandra Hernandez and John Luikart. For ease of reference, the defendant and counter-claimant shall be referred to as the "Trust."

[2] As discussed *infra*, Edward Darden filed a personal injury claim with the Trust in June 2017. Edward Darden died in June 2017 and his widow, Marvie Darden, is pursuing this claim as his successor-in-interest. The remaining Darden plaintiffs are Edward Darden's children. Marvie Darden and the Darden children have indicated that they intend to file wrongful death claims with the Trust. The Trust has stated that it will summarily reject such claims, and the Dardens accordingly seek declaratory relief that the Trust must administer their wrongful death claims when filed. To avoid confusion and with no disrespect intended, this court will refer to Edward Darden as "Edward."

ORDER
Case: 20-03026   Doc# 78   Filed: 08/05/21   Entered: 08/05/21 13:35:04   Page 2 of 20

genuine if there is sufficient evidence for a reasonable fact finder to hold in favor of the non-moving party, and a fact is "material" if it might affect the outcome of the case. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 1997).

The movant has both the initial burden of production and the ultimate burden of persuasion on their summary judgment motion. *Nissan Fire & Marine, Ins. Co., Ltd. v. Fritz Cos.*, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). The movant meets this burden either by negating an essential element of the opposing party's claim for relief or by showing that the opposing party does not have enough evidence of an essential element to carry their ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins., Co., Ltd. v. Fritz Cos., Inc.*, *supra*, 210 F.3d at 1102. This court must consider each motion separately to determine whether any genuine issue of material fact exists. Moreover, this court may, under Federal Rule of Bankruptcy Procedure 7056(f), grant summary judgment to a non-moving party as long as the parties have adequate notice that the issues are being handled in a potentially dispositive matter. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Gospel Missions of America v. City of Los Angeles*, 328 F.3d 548, 553 (9ᵗʰ Cir. 2003).[3]

For purposes of this memorandum decision, the court discerns the following undisputed facts: In March 1983, Edward commenced litigation in Alameda County Superior Court (the "1983 Alameda County Action") against a litany of defendants which manufactured, distributed and/or installed asbestos-containing products (the "Alameda County Complaint"). Edward alleged in the Alameda County Complaint that his lengthy career as a welder at various military and civilian shipyards exposed him to asbestos-containing products that were manufactured, distributed and/or installed by some or all of the eighteen named corporate defendants. Edward further alleged that he was "now suffering and will in the future suffer injury from asbestos-related disease," including asbestosis, asserted what appear to be stock-in-trade asbestos exposure causes of action for negligence, breach of warranty, strict liability, and market-share liability, and sought damages in amounts to be determined. Edward was represented by experienced asbestos plaintiff's counsel, and Western MacArthur Company and MacArthur Company were two of the named defendants.

---

[3] The Dardens and the Trust thoroughly briefed the merits of the release at issue herein.

3

Despite its lengthy history as an distributor of asbestos-containing products in Northern California, Western Asbestos Company ("Western Asbestos") was not named as a defendant by Edward. Western Asbestos's corporate history is extensively discussed in the well-trod decision of *Kaminski v. Western MacArthur Co.*, 175 Cal.App. 3d 445 (1985), and this court takes judicial notice of *Kaminski's* factual findings.

To summarize, Western Asbestos was formed in the early 1900's and became a Bay Area distributor of Johns-Manville asbestos products in the early 1930s. While the company was a reliable business, Western Asbestos encountered significant financial difficulties in the mid-1960s which forced it to seek an immediate capital infusion. The Western Asbestos shareholders eventually borrowed $300,000 from MacArthur Company, which was headquartered in St. Paul, Minnesota. MacArthur Company also (through a subsidiary) distributed Johns-Manville asbestos products, and its business relationship with the Johns-Manville Company dated back to the early 1900's.

The companies' loan agreement was accompanied by a "Memorandum of Agreement" which gave MacArthur Company full operational control of Western Asbestos. As the *Kaminski* court more fully explains,

> "MacArthur agreed to take over and assume the active management and control of all business operations; the agreement twice more used the phrase "take-over" to describe the transfer of managerial control. A MacArthur employee, Philip A. Taylor, was designated executive vice-president and full-time general manager of Western.
>
> MacArthur's managerial control was described as "without limitation," and included authority to supervise the purchase of materials and handling of inventory; the hiring, firing and fixing of wages of Western employees; management of sales activities and contract operations; purchase or leasing of real and personal property on behalf of Western; and the right to obtain financing and incur indebtedness in Western's name. Western's original three directors stayed on but had no role in the management of the business, and received nominal salaries. They were obligated by the agreement to approve and properly implement all recommendations by MacArthur pertinent to the management of the company. Both J. G. Ordway, MacArthur's president, and Philip Taylor were made directors of Western.
>
> MacArthur was to receive as fee 50 percent of Western's net profits. MacArthur agreed to loan Western a total of $300,000 for operating capital; existing loans to the corporation by its original directors and members of their families were subordinated to the MacArthur obligations. The agreement also required Western to place its ownership stock in escrow, and gave MacArthur the option to purchase the stock at the price of $300,000. Philip Taylor stated that MacArthur's intention was to eventually purchase Western if it began to make a profit.

On August 27, 1965, [Western Asbestos] circulated a memo to all Western employees, informing them of the management changeover and indicating that "[it] is anticipated that ultimately MacArthur Co. will purchase Western Asbestos Co."  A similar letter was sent to the company's suppliers.  Taylor wrote to Western customers informing them of the management change, stressing that the three original directors would be retained as inactive officers and directors "because of their vast knowledge in the fields covered by Western Asbestos"; the letter expressed the new management's intent to "carry on the administration responsibilities of this well-established, highly regarded firm," to provide "even greater service to our customers."

[¶]. On March 29, 1967, Western's board of directors held a special meeting attended by Ordway, Taylor, and the three original directors.  Ordway announced that because of a recent credit curtailment, further business operations were "impossible"; Ordway suggested that dissolution would be in the best interests of all parties involved.  MacArthur would form a new corporation, Western MacArthur Company, to distribute asbestos products in the Bay Area.  Ordway proposed that MacArthur be relieved of its management contract in exchange for waiver of MacArthur's rights to subordinate the loans of the original directors.  The board agreed and voted to cease business operations at the end of April.  The board expressed no objection to the formation of a new company to engage in asbestos distribution; accepted the resignation of Ordway and Taylor as members of the board; and appointed a representative to a liquidation committee to dispose of Western's assets.  Western's indebtedness to MacArthur was confirmed at $300,000.  MacArthur was given the right to purchase at least $200,000 worth of Johns-Manville products in Western's inventory, and at least $100,000 of other noncash assets.  MacArthur agreed to take over all of Western's outstanding contracts.  Western sold its goodwill and customer mailing lists and records to MacArthur for "a nominal amount to be agreed on later."  MacArthur agreed to assume all of Western's current contracts, including work in progress.

Upon formation, Western MacArthur assumed Western's contracts as of May 28, 1967; 45 of Western's 50 employees stayed on as employees of Western MacArthur.  Ordway and Taylor were installed as board members; Taylor was appointed vice-president.  Western MacArthur used Western's customer lists in conducting its new business.  Western MacArthur sent a letter to Western customers asking if it may "continue to serve" them, stressing that the new company had "the same experienced personnel" and offered "the same products, engineering and contracting services."  Western MacArthur continued to supply the same products and services as Western.  It employed the same sales personnel, warehousemen, truck drivers, and estimators.  Johns-Manville remained the primary supplier, and the product line and shipyard work remained essentially unchanged.  Orders addressed to "Western Asbestos" were filled by Western MacArthur.  Western MacArthur capitalized on Western's reputation.  Prior to the formation of Western MacArthur, people referred to "Western Asbestos" as "Western"; the verbal shortform continued to be used in reference to "Western MacArthur."

MacArthur never exercised its option to purchase Western's ownership stock.  At no time did Western MacArthur Company formally hold itself out to be the same corporate entity as Western Asbestos Company.  Western formally dissolved in 1969."

*Kaminski, supra* at 451 - 453.

Western MacArthur thus rose like a Phoenix from Western Asbestos's demise, and it

5

1    continued Western Asbestos's business operations with little change in personnel, contracts or

2    clients.

3       On December 18, 1986, Edward and Western MacArthur executed a Compromise and

4    Release in the 1983 Alameda County Action (the "Release"). The Release was one of a series of

5    settlement agreements that Edward executed with 1983 Alameda County Action defendants during

6    this period.

7       Edward received $1300 from Western MacArthur as compensation for his injuries, and in

8    exchange Edward provided a full release to Western MacArthur and several other unidentified

9    entities and individuals. The Release also indicates that Edward read the Release and that his

10    counsel explained its contents to him. While this court's forthcoming memorandum decision

11    regarding the wrongful death claims will examine the Release in greater detail, this order focuses on

12    the claims that Edward released on his own behalf.

13       The Release provides, in pertinent part, that in exchange for the $1300 payment, Edward

14    "[does] hereby release, acquit and forever discharge WESTERN ASBESTOS
     MACARTHUR COMPANY and any predecessor and/or alternative entities and/or
15    successors and all other person, individuals, firms, entities, companies and
     corporations controlled by or in conjunction with said parties, of any from any and all
16    actions, causes of action, claims, demand, damage, costs, loss of services, expenses
     and compensation, on account of, or in any way growing out of, any and all known
17    and unknown, existent or non-existent, personal injuries and property damages, for or
     because of any matter or thing done, omitted or suffered to be done by the parties
18    being released from the beginning of time to and including the date hereof arising out
     of or in any way connected with the occurrence of any or all exposure at any time to
19    asbestos and/or products containing asbestos by plaintiff.

20    THIS RELEASE is being particularly made in the following described accident,
     casualty and/or event, hereinafter referred to as accident: This settlement relates to
21    (plaintiff's) injuries resulting from an alleged exposure to asbestos and/or asbestos-
     containing products. The release further relates to all injuries now known and those
22    which may arise in the future. The release further relates to all causes of action
     including those for personal injury, loss of consortium and wrongful death."

23       The parties submitted a form Request for Dismissal on March 18, 1987, and the Alameda

24    County Superior Court entered a dismissal with prejudice on March 24, 1987. The dismissal stated

25    that it was "[a]s to defendant Western MacArthur Company and any predecessors and/or alternative

26    entities and/or successors only."

27       Edward and Western MacArthur signed the Release approximately one year after the First

28

Case: 20-03026    Doc# 78    Filed: 08/05/21    Entered: 08/05/21 13:35:04    Page 6 of 20

1  Appellate District for the California Court of Appeal issued *Kaminski v. Western MacArthur*

2  *Company*, *supra*.  The *Kaminski* decision significantly altered the asbestos litigation landscape in

3  Northern California.  The *Kaminski* court affirmed the trial court's determination that Western

4  MacArthur was Western Asbestos's corporate successor in interest for "purposes of product liability

5  for personal injuries arising from asbestos exposure," and that Western MacArthur was therefore

6  responsible for any damages arising from Western Asbestos's product liability.  175 Cal.App.3d,

7  *supra*, at 449.  While the *Kaminski* court recognized that a successor corporation was typically

8  shielded from the liabilities of its predecessor entity, it based its contrary holding on the public

9  policy principles espoused and test established in *Ray v. Alad Corp.*, 19 Cal. 3d 22(1977).  In *Ray v.*

10  *Alad Corp*, the California Supreme Court created an exception to  "traditional corporate law

11  doctrine" and established a three part test for determining whether a successor corporation was liable

12  for its predecessor's strict liability.  The *Kaminski* court affirmed the trial court's application of the

13  *Ray* test, noting that, among other things, "MacArthur engineered a takeover whereby its corporate

14  progeny, Western MacArthur, succeeded to the operations, goodwill, customer lists, and a name

15  similar to "Western Asbestos."  The essence of the takeover resulted in the transfer of assets and

16  goodwill sufficient to enable Western MacArthur to capitalize on its predecessor's industry and

17  reputation and continue distribution of Johns-Manville asbestos products."  *Kaminski*, *supra* at 458.

18  In 2002, Western MacArthur, MacArthur Company and Western Asbestos[4] filed Chapter 11

19  bankruptcies and proposed a joint Chapter 11 plan of reorganization (the "Joint Plan") to address

20  their pending and future asbestos exposure liabilities.  The Joint Plan - which was a product of

21  extensive, pre and post-petition negotiations between several constituencies[5] - created the Trust and

22  its accompanying Asbestos Personal Injury Settlement Trust Distribution Procedures (the "TDP")

23  and Case Valuation Matrix (the "Matrix;"collectively, the "Trust Documents").  The Trust was

24  _____

25  [4]  Western Asbestos was a dissolved corporation in "wind-up" mode when it filed its Chapter
26  11 bankruptcy.  Its "wind-up" efforts included litigation to compel insurance coverage for the
   asbestos claims against it.

27  [5] The Joint Plan was negotiated by representatives from the asbestos plaintiff's and defense
28  bar, the debtors, interested insurance companies, and the court appointed Futures Representative.

ORDER

primarily funded by substantial settlement payments from the debtors' insurance companies, and it "assume[d] the liabilities of each Debtor, and each of its respective successors in interest and their Affiliates, arising from or relating to Asbestos Related Claims and to use the Trust's assets and income to pay holders of Allowed Asbestos Related Claims in accordance with the Trust Agreement and in such a way that all holders of similar Allowed Asbestos Related Claims are treated in a substantially equivalent manner and to otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B)(I) of the Bankruptcy Code." Put in more plain terms, the Joint Plan and the Trust Documents created procedures for a) asbestos claimants to submit claims to the Trust, b) the Trust to evaluate and value those claims based on set criteria (or if the information provided to the Trust was insufficient to qualify for a "standard" offer, to value it based on an "Individual Review" process), and c) the Trust to pay a certain percentage of the assigned value, all under the aegis of Bankruptcy Code § 524(g) and without the need for extensive Superior Court litigation.[6] The Joint Plan and Trust Documents also authorized the Trust to investigate the merits of the filed claims, and they transferred to the Trust the Chapter 11 debtors' defenses to any asbestos claim. *See*, *e.g.*, § 6.8(d) of the "Disclosure Statement For Amended Joint Plan of Reorganization," filed April 3, 2003, and § 1.4(b) of the Western Asbestos Settlement Trust Agreement[7].

This court confirmed the Joint Plan in January 2004 after a lengthy, contested confirmation hearing. Several plaintiff's counsel who were actively involved in the negotiation of the Joint Plan and Trust documents testified during that hearing. Their testimony discussed the history of asbestos litigation settlements in the Northern District of California and the breadth of the releases that accompanied the settlements. The attorneys also discussed how *Kaminski* dramatically altered

---

[6] A claimant may, under the Trust Documents, reject the assigned monetary value and request binding or non-binding arbitration of his/her claim. If the claimant rejects the results of non-binding arbitration, they may commence Superior Court litigation to determine liability and damages (payment of which would still, however, be subject to certain limitations under the Trust Documents).

[7] As discussed by Laura Paul in her deposition testimony and her declarations submitted in support of the Trust's summary judgment motion, the Trust initially created an Access database to identify pre-bankruptcy asbestos claims that the debtors had settled. This database's software was defective, and its results were not always accurate.

8

Western MacArthur's potential liability due to Western Asbestos's decades of selling and installing asbestos containing products. *See also* James Penrod Declaration, ¶¶ 35 and 49.[8]

Edward was diagnosed with mesothelioma in 2016, and he submitted a claim to the Trust on June 26, 2017 to recover damages for "personal injuries and loss of consortium" due to this diagnosis (the "June 2017 Claim"). The Trust's claim form requires, among other things, that claimants disclose whether they had ever filed any "asbestos-related lawsuits." Edward did not disclose the 1983 Alameda County Action or the Release on the face of the claim form.[9] Edward died on September 5, 2017 and his widow, plaintiff Marvie Darden, is his successor in interest with regard to the June 2017 Claim.

The Trust spent several months analyzing the June 2017 Claim and initially offered to settle it in February 2018 based on an Individual Review process. Edward's counsel rejected this offer. While there is some confusion regarding how the Trust learned of the 1983 Alameda County Action, the Trust asked Edward's counsel about that litigation in early March 2019 and requested that his counsel provide it with the Release. After rummaging through its own records, the Trust located the Release in or about July 2019.[10] The Trust thereafter rejected the June 2017 Claim on the ground that the Release resolved all of Edward's asbestos related claims against Western Asbestos and

---

[8] The Dardens' objection to ¶ 35 of the Penrod Declaration is overruled. Penrod did not misstate *Kaminski*'s holding by opining on its practical effect.

[9] Edward's counsel filed the June 2017 Claim on Edward's behalf. There is some confusion regarding whether Edward's counsel knew of the 1983 Alameda County Action in June 2017, whether his counsel attached some documentation of the 1983 Alameda County Action to the claim form, and when and how the Trust ultimately learned about the 1983 Alameda County Action and the Release. (*See, e.g.,* Declaration of Laura Paul, filed on March 25, 2021, and the March 20, 2018 email from May Wong to Leah Cowen, in which Wong references Edward's *1986* deposition testimony). Edward did disclose on the claim form, however, asbestos-related litigation that he filed on February 14, 2017 in Alameda County Superior Court (through the same counsel) against several entities. The court is unaware of the status of that litigation.

[10] Laura Paul's March 25, 2021 declaration describes the process by which the Trust located the Release. Her deposition testimony discusses the significant number of "pre-bankruptcy" claim files that the Trust has in storage, the disheveled nature of its record keeping and how the Trust came to possess these records.

9

Western MacArthur. *See* December 3, 2019 email from Laura Paul to Matthew Thiel.[11]

The Dardens commenced this adversary proceeding on May 26, 2020 seeking declaratory relief that, *inter alia*, the June 2017 Claim is not barred by the Release. While Marvie Darden implicitly acknowledges that she cannot pursue a product liability claim against the Trust (since the Release - under *Kaminski* - resolved Edward's product liability claims against both Western MacArthur and Western Asbestos), she contends that the Release did not eliminate Edward's *negligence* claim against Western Asbestos. Marvie Darden argues that *Kaminski* determined that "Western MacArthur Company was the successor-in-interest to Western Asbestos Company *only* for purposes of strict products liability - *not* for purposes of Western Asbestos Company's pre-May 1967 negligence that contributed to Eddie's asbestos exposures and resulting mesothelioma." [emphasis in the original.]. She thus requests declaratory relief compelling the Trust to fully administer the June 2017 Claim.

The Trust answered the Dardens' complaint and asserted several declaratory relief counter-claims and related affirmative defenses, including a request for declaratory relief that the June 2017 Claim is barred by the doctrine of claim preclusion (the "First Counter-Claim").[12] The Dardens answered the counter-claims and asserted several affirmative defenses, which contend, among other things, that the First Counter-Claim is barred by the doctrines of laches and waiver and the statute of limitations found in California Code of Civil Procedure § 366.2.

Marvie Darden seeks summary judgment on her declaratory relief action regarding the June 2017 Claim, contending that Edward did not release his negligence cause of action against Western Asbestos. The Trust opposes Marvie Darden's summary judgment motion and seeks summary judgment on the First Counter-Claim.

This court has jurisdiction over this adversary proceeding. A bankruptcy court has jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). At the very least, this adversary proceeding is "related to" the

_____

[11] The court understands that the Trust lists the rejection date as February 24, 2020.

[12] The Trust also asserted a claim preclusion affirmative defense.

ORDER
Case: 20-03026    Doc# 78    Filed: 08/05/21    Entered: 08/05/21 13:35:04    Page 10 of 20

underlying Chapter 11 cases. While a bankruptcy court's subject matter jurisdiction narrows post-confirmation, it still retains jurisdiction to resolve matters where there is a "close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter. [citation omitted.]" *Montana v. Golden (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1194 (9th Cir. 2005). The Ninth Circuit approvingly cited to the Third Circuit's reasoning in *In re Resorts Int'l, Inc.*, 372 F.3d 154, 166-67 (3rd Circ. 2004) and noted that "in cases involving continuing trusts (such as litigation trusts, or, as here, a liquidating trust), trusts 'by their nature maintain a connection to the bankruptcy even after the plan has been confirmed.'" [citation omitted.] *Ibid*. It also agreed with the *In re Resorts Int'l*'s reasoning that "matters affecting 'the interpretation, implementation, consummation, execution or administration of the confirmed plan will typically have the requisite close nexus.'" [citation omitted.]. *Ibid*.

The Trust is the *raison d'etre* of the Joint Plan, and its core principle is to "provide reasonable assurance that [it] will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." Bankruptcy Code § 524(g)(2)(B)(ii)(V). While this adversary proceeding only addresses a few potential claims against the Trust, the Trust contends that an adverse ruling could result in a flood of new claims against it that may possibly jeopardize its ability, after 17 years, to meet its § 524(g) obligations. In addition, the Dardens' wrongful death declaratory relief claims will require this court to interpret the Trust and the Trust Documents. Accordingly, there is a sufficiently close nexus between this adversary proceeding and the Joint Plan to provide this court with subject matter jurisdiction.[13]

## I. Edward Released All Asbestos-Related Claims Against Western Asbestos

Marvie Darden seeks summary judgment that Edward did not release his negligence claim against Western Asbestos. This court finds otherwise, and grants summary judgment in the Trust's favor under Federal Rule of Bankruptcy Procedure 7056(f).

---

[13] As the Dardens correctly note, the Trust and the Trust Documents allow the Trust to adjust the payment percentage. Finally, several of the Trust's counterclaims seek indemnity or contribution if the Dardens prevail on their wrongful death declaratory relief action. At the very least, this court can exercise supplemental jurisdiction over these counterclaims. *See In re Pegasus Gold Corp.*, *supra*, at 1194.

11

Litigation releases are contracts, and under California law, a third party such as Western Asbestos (and now its successor in interest, the Trust) may enforce a release if the contracting parties intended that party to benefit from it. *Neverkovec v. Fredericks*, 74 Cal. App, 337, 348-49 (1999).[14] *Neverkovec v. Fredericks* provides this court with some basic guidelines for interpreting releases. In *Neverkovec*, the court of appeals reversed a summary judgment order in favor of a third party who sought to enforce a release executed as part of a car crash settlement agreement. *Neverkovec* involved a two car collision caused by the driver of the car in which the plaintiffs were passengers. The plaintiffs initially sued their car's driver and the car owner (a corporate rental car company), but they did not name as a defendant the other car's driver ("Fredericks," who apparently was not at fault according to the police report). The plaintiffs and the named defendants settled their litigation, and the release language identified not only the named defendants and their insurance company, but also (among others) "any other person . . . charged or chargeable with responsibility or liability . . . ." The release also contained language which indicated, however, that the plaintiffs reserved the right to sue other parties, and that they would hold the insurance company harmless for any additional payments the insurance company might make on account of their injuries. The plaintiffs subsequently sued Fredericks, who moved for summary judgment based on the release. The trial court literally interpreted the release and granted Frederick's motion. The court of appeals reversed. While the appellate court ultimately found the release ambiguous given the plaintiffs' apparent reservation to sue other parties (such as Fredericks), it first examined how a court should address a third party's request to enforce release terms. The court of appeals held:

> "A third party should not be permitted to enforce covenants made not for his benefit, but rather for others. He is not a contracting party; his right to performance is predicated on the contracting parties' intent to benefit him." The circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement. The contracting parties must have intended to confer a benefit on the third party." [citations omitted.] It is not necessary for the third party to be specifically named in the contract, but such a party bears the burden of proving that the promise he seeks to enforce was actually made to him

---

[14] *Neverkovec* acknowledges that other California appellate courts have enforced releases on behalf of third parties based solely on the release's plain language. *See, e.g.*, *General Motors Corp. v. Superior Court*, 12 Cal.App.4th 435 (1993); *Lama v. Comcast Cablevision*, 14 Cal.App.4th 59 (1993). This court believes that *Neverkovec* represents present California law.

12

personally or to a class of which he is a member. In making that determination, the court must read the contract as a whole in light of the circumstances under which it was entered.

Thus, to obtain summary judgment on the ground that a general release has discharged him from liability, a third party to the release agreement must affirmatively show that the parties intended to release him. The burden of proof is on the third party, under both contract law and the summary judgment statute. (§ 437c, subd. (o).) Because the court must consider the circumstances of the contracting parties' negotiations to determine whether a third party not named in the release was an intended beneficiary, it will seldom be sufficient for the third party simply to rely on a literal application of the terms of the release. "The fact that . . . the contract, if carried out to its terms, would inure to the third party's benefit[,] is insufficient to entitle him or her to demand enforcement." "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." ( Civ. Code, § 1648.) "Whether a third party is an intended beneficiary . . . to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered."*Neverkovec, supra* at 348-49.

*Neverkovec* also focused on what evidence a court should consider in making this determination. The *Neverkovec* court held that even an apparently unambiguous general release is "properly interpreted in light of the surrounding circumstances. *Id.* at 351. It further held that:

"while the contracting parties may testify regarding their actual intent, the sufficiency of such evidence must be determined according to the usual objective standard of contract interpretation. The trier of fact must decide how a reasonable person in the releasing party's shoes would have believed the other party understood the scope of the release. Thus, testimony by the releasing party regarding who he thought he was releasing, while it may serve to explain the situation, does not determine the legal effect of the release. How a reasonable person would view the other party's understanding of the release is generally a matter of inference based on the extrinsic evidence. Unless that extrinsic evidence is in conflict, the question is one of law. On a motion for summary judgment, the court may determine which inferences are "reasonably deducible from the evidence," and may grant summary judgment if there is no conflict with other reasonable inferences or evidence. (§ 437c, subd. (c).)" *Id.* at 351.[15]

The Dardens and the Trust have not (for some obvious reasons) submitted declarations from the contracting parties, and they are not at odds regarding the facts and circumstances surrounding

---

[15] While this court is applying federal summary judgment standards, it may still draw inferences from direct evidence. *See, e.g.*, *EEOC v. Boeing Co.*, 577 F.3d 1044, 1050 (9th Cir. 2009). Inferences must be viewed in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014). In this instance, Marvie Dolan is the moving party. The court reminds the parties that the Trust's summary judgment motion is based on claim preclusion.

13

the 1983 Alameda County Action, the Release (at least as to Edward's personal causes of action) and Western MacArthur's corporate history. The pertinent evidence before this court includes the Alameda County Complaint, the Release, the Alameda County Complaint's dismissal order, the *Kaminski* court's factual findings and holding, and the confirmation hearing testimony and Penrod declaration to the extent they describe the state of asbestos litigation in the 1980s, how such litigation was settled, and the perceived settlement goals of asbestos defendants such as Western MacArthur. Not surprisingly, this latter evidence indicates that Western MacArthur wanted broad releases.

These undisputed facts demonstrate that an objectively reasonable person in Edward's shoes would have understood that Western MacArthur intended the Release to include Western Asbestos. Edward, represented by experienced asbestos counsel, named numerous defendants to recover damages due to asbestos exposure that began in the early 1950s, which conceivably included exposure to products sold and/or installed by Western Asbestos. While the Alameda County Complaint named numerous defendants, it did not specifically allege that any one of the defendant's negligence or wrongful conduct exposed him to asbestos at any particular time - hence the "market share" liability cause of action. Under the Release, Edward Darden accepted $1300 and broadly released named and unnamed parties - the consideration requested by Western MacArthur. One of the many entities that Edward released was Western MacArthur's "predecessor entity." Black's Law Dictionary (8th ed. 2004) defines "predecessor as "One who precedes another in an office or position . . . An ancestor. The *Kaminski* court's careful analysis - issued before the parties executed the Release - established as a matter of law that Western Asbestos was Western MacArthur's one and only predecessor. Given the *Kaminski* court's findings and holding, the fact that the Release sought a broad release of liability from Darden's asbestos exposure, and that the dismissal order included Western MacArthur's predecessor entity, a reasonable person in Darden's position would believe that Western MacArthur sought a release of Western Asbestos.

Accordingly, this court concludes as a matter of law that Western Asbestos was an intended beneficiary of the Release, and that Edward released all of his asbestos-related claims against it.

This court rejects the Dardens' argument that *Kaminski* prevents this court from so holding. *Kaminski* applied the *Ray v. Alad Corp.* public policy factors and determined as a *matter of law* that Western MacArthur was Western Asbestos's successor in interest for product liability. As the Dardens correctly note, no court has held, as a matter of law, that Western MacArthur is also liable for Western Asbestos's negligence in selling/installing asbestos containing products. *Ray's* public policy pronouncements, however, are of no matter here. The question before this court is one of contract interpretation. *Kaminski* did not prevent Edward and Western MacArthur from voluntarily contracting to release Western MacArthur's predecessor entity. They did, and the Trust may enforce the Release.

**II. The June 2017 Claim Is Barred by Claim Preclusion**

The court now turns to the Trust's summary judgment motion, which argues that the June 2017 Claim is barred by claim preclusion. Under California law, there are three elements to this doctrine: 1) the decision in the prior proceeding is final and on the merits; 2) the present action is on the same "cause of action" as the prior proceeding; and 3) the parties in the present action or parties in privity with them were parties to the prior proceeding. *Zevnik v. Superior Court*, 159 Cal.App. 4th 76 (2008). The Trust easily satisfies the first element, as the Alameda County Complaint's dismissal with prejudice constituted a final judgment on the merits. *Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty & Surety Co. of America*, 133 Cal.App.4th 1319, 1328-29 (2005).

While the remaining two elements pose interesting questions, the court finds that the Trust has established both as a matter of law. First, the June 2017 Claim falls within the "causes of action" that Edward and Western MacArthur litigated and resolved in the 1983 Alameda County Action. Claim preclusion does not attempt to compare the legal theories or labels used in the prior and present litigation but instead focuses "on the primary right sought to be protected in the two actions." *Johnson v. GlaxoSmithKline, Inc.,*166 Cal.App.4th 1497, 1517, fn. 17 (2008); *Crowley v. Katleman,* 8 Cal.4th 666 (1994). The California Supreme Court held in *Boeken v. Philip Morris USA, Inc.*, 48 Cal.4th 788, 797 (2010) that:

"[t]o determine whether two proceedings involve identical causes of action for purposes of claim preclusion, California courts have "consistently applied the 'primary rights' theory." Under this theory, "[a] cause of action ... arises out of an antecedent primary right and corresponding duty and the delict or breach of such primary right and duty by the person on whom the duty rests. 'Of these elements, the primary right and duty and the delict or wrong combined constitute the cause of action in the legal sense of the term ... .' "

"In California the phrase 'causes of action' is often used indiscriminately ... to mean counts which state [according to different legal theories] the same cause of action ... ." But for purposes of applying the doctrine of res judicata, the phrase "cause of action" has a more precise meaning: The cause of action is the right to obtain redress for a harm suffered, regardless of the specific remedy sought or the legal theory (common law or statutory) advanced. As we explained in Slater v. Blackwood, supra, 15 Cal.3d at page 795: "[T]he 'cause of action' is based upon the harm suffered, as opposed to the particular theory asserted by the litigant. [Citation.] Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief. 'Hence a judgment for the defendant is a bar to a subsequent action by the plaintiff based on the same injury to the same right, even though he presents a different legal ground for relief.'"

*See also Richard B. LeVine, Inc. v. Higashi,* 131 Cal.App.4th 566, 575 (2005).

The parties agree that the Release resolved Edward's product liability claim against Western Asbestos. The "primary right" underlying that liability was Edward's right not to be exposed to asbestos-containing products that Western Asbestos sold and/or installed, and his product liability and negligence causes of action against Western Asbestos arose equally from this right. So, under *Boeken*, Edward sought to avoid exposure to dangerous, asbestos-containing products; b) Western Asbestos had a duty not to market and/or install dangerous asbestos-containing products; and c) Western Asbestos breached that duty. Western MacArthur was equally liable for the breach of this primary right. The resolution of Edward's claims against Western MacArthur included the resolution of this primary right, and the Release therefore bars a direct claim against the entity (Western Asbestos) which is the source of that derivative liability. *See Richard B. LeVine, supra,* at 131 Cal.App.4th 566, 577 and cases cited therein.

Finally, Western Asbestos was in privity with Western MacArthur. "[P]rivity requires the sharing of an identity or community of interest with adequate representation of that interest in the first suit, and circumstances such that the nonparty should reasonably have expected to be bound by the first suit."*DKN Holdings LLC v. Faerber*, 61 Cal.4th 813, 826 (2015). Put another way, "[t]he

16

1  emphasis is not on a concept of identity of parties, but on the practical situation.  The question is

2  whether the non-party is sufficiently close to the original case to afford application of the principle of

3  preclusion." [citations omitted].  *Castillo v. Glenair*, 23 Cal.App.5th 262, 277 (2018).  The

4  relationship between Western Asbestos and Western MacArthur satisfy this criteria. The Alameda

5  County Complaint put at issue Western MacArthur's liability for Edward's asbestos exposure, which

6  included Western Asbestos's product liability.

7  **III.    The Dardens' Statute of Limitations Argument Against the Trust's First Counter-Claim Fails.**

8       The Dardens argue that the First Counter-Claim and related claim preclusion affirmative

9  defense are time-barred under California Code of Civil Procedure § 366.2.  The court disagrees.

10  Section 366.2 provides in pertinent part that "(a) If a person against whom an action may be brought

11  on a liability of the person, whether arising in contract, tort or otherwise, and whether accrued or not

12  accrued, dies before the expiration of the applicable statute of limitations period, and the cause of

13  action survives, an action may be commenced within one year after the date of the death, and the

14  limitations period that would have been applicable does not apply."  The statute further provides in

15  subsection ( c ) that "This section applies to actions brought on liabilities of persons dying on or after

16  January 1, 1993."

17       The Dardens do not, for good reason, cite any caselaw in support of their statute of limitations

18  defense because § 366.2 only applies to claims seeking to collect on a "debt of the decedent."  *See*

19  *Stoltenberg v. Newman*, 179 Cal.App.4th 287 (2009).  The *Stoltenberg* court reviewed § 366.2's

20  history and noted that "In discussing the broad purposes of section 366.2, the [California] Supreme

21  Court in *Rumsey*, *supra*, 24 Cal.4th 301, stated, "The overall intent of the Legislature in enacting

22  Code of Civil Procedure former section 353 [now section 366.2] was to protect decedents' estates

23  from creditors' stale claims. [Citations.] … [¶] The December 1989 California Law Revision

24  Commission recommendation on the proposed legislation amending Code of Civil Procedure former

25  section 353 explained that 'the one year statute of limitations is intended to apply in any action on a

26  debt of the decedent, whether against the personal representative under Probate Code Sections 9350

27

28

17

to 9354 (claim on cause of action), or against another person, such as a distributee under Probate Code Section 9392 (liability of distributee), a person who takes the decedent's property and is liable for the decedent's debts … or a trustee.' [Citation.] It thus appears that when the amendments to former section 353 were enacted, they were done so with the clear understanding and intent that such provisions would govern and apply to 'any action on a debt of the decedent,' regardless of whom the action was brought against … ."

The First Counter-Claim seeks declaratory relief that the June 2017 Claim is barred by claim preclusion; it is not attempting to collect any debt against Edward, his estate, or the Dardens. Moreover, none of the Trust's affirmative defenses, by definition, seek to collect a debt.

## IV. The Dardens' Affirmative Defenses of Laches And Waiver Are Insufficiently Presented.

The Dardens generally assert that the Trust's counter-claims are barred by the doctrines of laches and/or waiver. Laches "requires unreasonable delay in bringing suit "plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay." Prejudice is never presumed; rather it must be affirmatively demonstrated by the defendant in order to sustain his burdens of proof and the production of evidence on the issue. Generally speaking, the existence of laches is a question of fact to be determined by the trial court in light of all of the applicable circumstances, and in the absence of manifest injustice or a lack of substantial support in the evidence its determination will be sustained." *Miller v. Eisenhower Medical Center*, 27 Cal.4th 614, 624 (1980). Waiver, in turn, is an affirmative defense that requires the Dardens to demonstrate that the Trust intentionally relinquished a right or that its acts were so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right had been relinquished. *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 33-34.

The Dardens devote a single paragraph to these factually intensive defenses. They make no attempt to apply law to undisputed fact, and apparently hope that the court will do their homework. The Dardens have not demonstrated why the time between submission and rejection of the June 2017 Claim was unreasonable, what exactly the Trust acquiesced to, and what prejudice resulted when the Trust rejected the June 2017 Claim (other than the fact that Marvie Darden did not receive some

18

undisclosed sum).  Nor have the Dardens attempted to establish any of Waiver's elements.  The court therefore declines to grant summary judgment against the First Counter-Claim based on these affirmative defenses.

WHEREFORE, the court denies the Dardens' summary judgment motion with regard to the June 2019 Claim, and grants summary judgment in favor of the Trust on the June 2017 Claim.

**\*\*\* END OF ORDER \*\*\***

**COURT SERVICE LIST**

Recipients are ECF participants

ORDER

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California