

The following constitutes the order of the Court.
Signed: September 13, 2021

_____
**Charles Novack**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>WESTERN ASBESTOS CO.,<br><br>    Debtor. | Case No. 13-31914 HLB<br><br>Chapter 11 |
| MARVIE DARDEN, individually and as successor in interest to Eddie Darden, CHRISTOPHER DARDEN, DEBORA DARDEN, LAWRENCE DARDEN, ROSALIND DARDEN KEETON, ANITA GARDYNE, ANGELA NEWSOME,<br><br>    Plaintiffs,<br>vs.<br><br>WESTERN ASBESTOS SETTLEMENT TRUST,<br>    Defendant. | Adversary No. 20-3026 CN<br><br>**MEMORANDUM DECISION RE: WRONGFUL DEATH CLAIMS, GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT REGARDING SCOPE OF RELEASE, AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT REGARDING WHETHER TRUST MUST CONSIDER AND ADMINISTER PLAINTIFFS' WRONGFUL DEATH CLAIMS** |
| SANDRA R. HERNANDEZ, Trustee Western Asbestos Settlement Trust, JOHN F. LUIKART, Trustee of Western Asbestos Settlement Trust, WESTERN ASBESTOS SETTLEMENT TRUST, Trustee of Western Asbestos Settlement Trust<br><br>    Counter-Claimants,<br>vs.<br><br>MARVIE DARDEN, individually and as successor in interest to Eddie Darden, CHRISTOPHER DARDEN, DEBORA DARDEN, LAWRENCE DARDEN, ROSALIND DARDEN KEETON, ANITA GARDYNE, ANGELA NEWSOME,<br><br>    Counter-Defendants. | |

1

On June 18, 2021, this court conducted a hearing on the cross-motions for summary judgment filed by plaintiffs Marvie Darden, Christopher Darden, Debora Darden, Lawrence Darden, Rosalind Darden Keeton, Anita Gardyne and Angela Newsome (collectively, the "Dardens") and defendant and counter-claimant Western Asbestos Settlement Trust.[1] All appearances were noted on the record. This adversary proceeding addresses whether the Trust must consider and compensate the Dardens for the asbestos related claims they (and Edward Darden) have filed or intend to file with the Trust. The Trust was created under Bankruptcy Code §524(g) to resolve tort claims arising from exposure to the asbestos-containing products distributed by Chapter 11 debtors Western Asbestos Company, Western MacArthur Company, and MacArthur Company. Since it began its work in 2004, the Trust has addressed thousands of claims without bankruptcy court intervention. The Dardens and the Trust now seek, however, declaratory relief to determine, *inter alia*, whether the Trust must administer the personal injury claim filed by Edward Darden in June 2017 and any wrongful death claim that the Dardens may file.[2] On August 5, 2021, this court issued a memorandum decision which denied the Dardens' summary judgment motion regarding Edward Darden's personal injury Trust claim, and granted summary judgment in the Trust's favor. This memorandum decision addresses the parties' cross-motions for summary judgment regarding the Dardens' potential wrongful death claims.

The summary judgment standard under Federal Rule of Bankruptcy Procedure 7056 is well established. A party is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The trial court does not weigh the evidence but merely determines whether material facts remain in dispute.

---

[1] The Trust is appearing through its trustees - Sandra Hernandez and John Luikart. For ease of reference, the defendant and counter-claimant shall be referred to as the "Trust."

[2] Edward Darden filed a personal injury claim with the Trust in June 2017. Edward Darden died in September 2017 and his widow, Marvie Darden, is pursuing this claim as his successor-in-interest. The remaining Darden plaintiffs are Edward Darden's children. Marvie Darden and the Darden children have indicated that they intend to file wrongful death claims with the Trust. The Trust has stated that it will summarily reject such claims, and the Dardens accordingly seek declaratory relief that the Trust must administer their wrongful death claims when filed. To avoid confusion and with no disrespect intended, this court will refer to Edward Darden as "Edward."

This court must also draw all reasonable inferences in favor of the non-moving party. A dispute is genuine if there is sufficient evidence for a reasonable fact finder to hold in favor of the non-moving party, and a fact is "material" if it might affect the outcome of the case. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 1997).

The movant has both the initial burden of production and the ultimate burden of persuasion on their summary judgment motion. *Nissan Fire & Marine, Ins. Co., Ltd. v. Fritz Cos.*, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). The movant meets this burden either by negating an essential element of the opposing party's claim for relief or by showing that the opposing party does not have enough evidence of an essential element to carry their ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins., Co., Ltd. v. Fritz Cos., Inc.*, *supra*, 210 F.3d at 1102. When cross-motions for summary judgment are filed, the court must consider evidence submitted in support of and in opposition to both motions before ruling on either motion. Thus, a court ruling on one motion must consider evidence submitted in favor of the opposing motion to determine whether a triable issue of fact exists. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Moreover, this court must view each cross-motion independently, viewing evidence and inferences in the light most favorable to each nonmoving party in turn.

The undisputed material facts stated in the August 5, 2021 memorandum decision are restated here as appropriate.[3] The cross-motions at issue require this court, however, to identify additional undisputed facts that are particularly relevant to the wrongful death claim dispute. Accordingly, the pertinent, undisputed facts are as follows: In March 1983, Edward commenced litigation in Alameda County Superior Court (the "1983 Alameda County Action") against a litany of defendants which manufactured, distributed and/or installed asbestos-containing products (the "Alameda County Complaint"). Edward alleged in the Alameda County Complaint that his lengthy career as a welder at various military and civilian shipyards exposed him to asbestos-containing products that were manufactured, distributed and/or installed by some or all of the eighteen named

---

[3] The court also incorporates herein the August 5, 2021 memorandum decision's discussion regarding subject matter jurisdiction.

corporate defendants. Edward further alleged that he was "now suffering and will in the future suffer injury from asbestos-related disease," including asbestosis, asserted what appear to be stock-in-trade asbestos exposure causes of action for negligence, breach of warranty, strict liability, and market-share liability, and sought damages in amounts to be determined. Edward was represented by experienced asbestos plaintiff's counsel, and Western MacArthur Company and MacArthur Company were two of the named defendants.

On December 18, 1986, Edward and Western MacArthur executed a Compromise and Release in the 1983 Alameda County Action (the "Release"). The Release was one of a series of settlement agreements that Edward executed with 1983 Alameda County Action defendants during this period.

Edward received $1300 from Western MacArthur as compensation for his injuries, and in exchange Edward fully released his personal, asbestos-related claims against Western MacArthur and other parties. The Release provides in pertinent part that Edward

> "[does] hereby release, acquit and forever discharge WESTERN MacARTHUR COMPANY and any predecessors and/or alternative entities and/or successors and all other persons, individuals, firms, entities, companies and corporations controlled by or in conjunction with said parties, of any from any and all actions, causes of action, claims, demands, damage, costs, loss of services, expenses and compensation, on account of, or in any way growing out of, any and all known and unknown, existent or non-existent, personal injuries and property damages, for or because of any matter or thing done, omitted or suffered to be done by the parties being released from the beginning of time to and including the date hereof arising out of or in any way connected with the occurrence of any or all exposure at any time to asbestos and/or products containing asbestos by plaintiff.
>
> THIS RELEASE is being particularly made in the following described accident, casualty and/or event, hereinafter referred to as accident: This settlement relates to (plaintiff's) injuries resulting from an alleged exposure to asbestos and/or asbestos-containing products. The release further relates to all injuries now known and those which may arise in the future. The release further relates to all causes of action including those for personal injury, loss of consortium and wrongful death.
>
> THIS RELEASE is made on behalf of the undersigned, his/her/their heirs, executors, administrators and assigns. THE UNDERSIGNED AGREES as further consideration and inducement for this compromise settlement that it shall apply to all unknown and unanticipated injuries and damages resulting from said accident, as well as those now disclosed. [¶¶]
>
> THE UNDERSIGNED REPRESENTS that he has caused to be filed in the Superior Court of the State of California, in and for the County of Alameda, an action bearing Docket No. 570033-2 and entitled EDDIE DARDEN vs. RAYBESTOS-MANHATTEN, INC., WESTERN MacARTHUR COMPANY, et al.

> That as a part of the consideration for the payment of the settlement consideration, the undersigned agrees to dismiss said action with prejudice as to this settling Defendant only. [¶¶]
>
> THE UNDERSIGNED AGREES for himself, his heirs, executors, administrators and assigns, to INDEMNIFY AND FOREVER HOLD HARMLESS the parties herein being released, from any loss through the assertion by a stranger thereto, whether by way of subrogation, assignment or otherwise, of a claim or claims covering the subject matter of this release, and from any misrepresentations herein made by the undersigned, and from any and all liability to which the undersigned may be subjected by reasons of claims advanced by the heirs of the undersigned pursuant to SECTION 377, CODE OF CIVIL PROCEDURE of the State of California."[4]

None of the Dardens signed the Release, and they uniformly testified during their depositions that they were unaware of the Release and thus did not consent to any waiver of any future claims, including wrongful death claims, against Western MacArthur or any other party. Nor does the Release state that Edward was authorized to release any claims on his children or spouse's behalf. Edward and Western MacArthur submitted a form Request for Dismissal on March 18, 1987, and on March 24, 1987, the Alameda County Superior Court entered a dismissal with prejudice "[a]s to defendant Western MacArthur Company and any predecessors and/or alternative entities and/or successors only."

In 2002, Western MacArthur, MacArthur Company and Western Asbestos[5] filed Chapter 11 bankruptcies and proposed a joint Chapter 11 plan of reorganization (the "Joint Plan") to address their known and future asbestos exposure liabilities. The Joint Plan was confirmed in January 2004 after a lengthy confirmation hearing. The Joint Plan - which resulted from extensive, pre and post-

---

[4] In drafting this memorandum decision, the court discovered that its recitation of the Release in the August 5, 2021 memorandum decision contained two errors: The court inserted the word "ASBESTOS" in the name of Western MacArthur, and it used the singular of the word "predecessor" instead of the plural. These mistakes were inadvertent and do not change the court's analysis.

[5] Western Asbestos was a dissolved corporation in "wind-up" mode when it filed its Chapter 11 bankruptcy. Its "wind-up" efforts included litigation to compel insurance coverage for the asbestos claims against it. Western Asbestos, Western MacArthur and the MacArthur Company shall collectively be referred to as the "Debtors."

petition negotiations between several constituencies[6] - created the Trust and its accompanying Asbestos Personal Injury Settlement Trust Distribution Procedures (the "TDP") and Case Valuation Matrix (the "Matrix;"collectively, the "Trust Documents"). The Trust was primarily funded by substantial settlement payments from the Debtors' insurance companies, and it

> "assume[d] the liabilities of each Debtor, and each of its respective successors in interest and their Affiliates, arising from or relating to Asbestos Related Claims and to use the Trust's assets and income to pay holders of Allowed Asbestos Related Claims in accordance with the Trust Agreement and in such a way that all holders of similar Allowed Asbestos Related Claims are treated in a substantially equivalent manner and to otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B)(I) of the Bankruptcy Code." Trust, § 1.2.

Put more plainly, the Joint Plan and the Trust Documents created procedures for a) asbestos claimants to submit claims to the Trust, b) the Trust to evaluate and value those claims based on set criteria (or if the information provided to the Trust was insufficient to qualify for a "standard" offer, to value it based on an "Individual Review" process), and c) the Trust to pay a certain percentage of the assigned value, all under the aegis of Bankruptcy Code § 524(g) and without the need for extensive Superior Court litigation.[7] The Joint Plan and Trust Documents also authorized the Trust to investigate the merits of the filed claims, and they transferred to the Trust the Debtors' defenses to any asbestos claim. *See*, *e.g.*, § 6.8(d) of the "Disclosure Statement For Amended Joint Plan of Reorganization," filed April 3, 2003, and § 1.4(b) of the Trust.

The cross-motions addressing the Dardens' wrongful death claims require this court to

---

[6] The Joint Plan (which was the Second Amended Plan of Reorganization) was proposed by the Debtors, the Official Creditors' Committee, and the Hon. Charles Renfrew, who acted as the Futures Representative. The members of the Official Creditors' Committee were all asbestos claimants or their attorneys. The Futures Representative "was appointed by the bankruptcy court to represent the holders of "future demands": i.e., the right to payment by individuals who have been exposed to asbestos but are not yet aware that they have suffered an injury." *In re W. Asbestos*, 313, B.R. 832, ft. 2 (Bankr. N.D.Cal. 2003). The Joint Plan was served by various methods, including by publication.

[7] A claimant may, under the Trust Documents, reject the proposed damages award and request binding or non-binding arbitration of their claim. If the claimant rejects the results of non-binding arbitration, they may commence Superior Court litigation to determine liability and damages (payment of which would still, however, be subject to certain limitations under the Trust Documents).

6

carefully review, *inter alia*, the Joint Plan, Trust Documents and the extensive confirmation hearing testimony. The Joint Plan and Trust Documents addressed the increasing disfunction of asbestos litigation in Northern California. The Debtors, the plaintiff and defense asbestos bar and the Futures Representative all acknowledged that Superior Court asbestos litigation was becoming unworkable, as the cohort of solvent asbestos defendants (along with their insurance coverage) shrank while the contentiousness of insurance coverage litigation increased. These developments eventually turned asbestos litigation into a race to the courthouse. The Joint Plan's proponents believed that the only feasible resolution was to create a Trust under Bankruptcy Code § 524(g) which would channel asbestos plaintiffs (who alleged that they had suffered damages arising from exposure to asbestos products manufactured, sold, installed, and/or removed by the Debtors) to file claims with the Trust. As the Join Plan's Disclosure Statement duly noted, the Trust's goal:

> "is fair and equitable treatment of all present claimants who have a personal injury, and all individuals who manifest injuries in the future, from asbestos or asbestos-containing products distributed, sold, handled, installed, stored or removed by the Debtors. The Trust is designed to protect those who are not presently injured but may develop an Asbestos Related Claim in the future by retaining sufficient funds in the Trust to compensate such future holders of Asbestos Related Claims to the extent of available Trust Assets."

The Trust contained a similarly stated directive. *See* Article 1, § 1.2 of the Trust. The Joint Plan's Glossary broadly defines the phrase "Asbestos Related Claim" to mean "any Claim Relating to Personal Injury Caused By Asbestos and any Indirect Asbestos Related Claim." In turn, a "Personal Injury" means "physical, emotional, bodily or other personal injury, sickness, disease or death, whether or not diagnosable or manifested before the Confirmation Date or the close of the Reorganization Cases," and the phrase "Caused by Asbestos" is defined as being

> "caused or allegedly caused, in whole or in part, directly or indirectly, by (a) asbestos or asbestos-containing products, including without limitation, the fabrication or mining of, sale of, installation of, removal of, destruction of, exposure to, presence of, or alleged failure to warn about asbestos, asbestos-containing products, asbestos fibers, asbestos dust, or any operation in which such asbestos, asbestos fibers, asbestos dust or asbestos-containing products may have been used; or (b) services, actions or operations, including services, actions or operations provided, completed or taken by a Debtor in connection with asbestos or asbestos-containing product."

With this laudable goal in mind, the Trust Documents implemented procedures and guidelines that allow claimants who hold liquidated or unliquidated claims to submit written claims

ORDER
Case: 20-03026    Doc# 88    Filed: 09/13/21    Entered: 09/13/21 09:56:06    Page 7 of 20

with the Trust and promptly receive compensation for their injuries. Because the Dardens's purported wrongful death claims are unliquidated, this court will focus on the procedures and guidelines addressing those claims.

First, to avoid time-consuming state court discovery to ascertain the extent of a claimant's exposure, injuries and damages, claimants submit a Trust claim form that a) states how, where and when they were exposed to asbestos, b) provides specific information regarding their overall health and nature of their asbestos related diseases/diagnoses, and c) provides other personal and financial information that helps the Trust apply "multipliers" to the Matrix's base damages amounts. To further streamline the process, the Trust begins its claim analysis by slotting claimants into one of several "Asbestos-Related Disease Categories" (ranging from non-malignant ailments to several forms of asbestos induced cancer, including mesothelioma), to which the Matrix assigns a base damages amount.[8] The Trust established the base damage amounts by examining the Debtors' settlement history with asbestos plaintiffs suffering from these specific diseases. The more dire the diagnosis, the greater the base damages award. The Matrix then considers several other factors, such as age, family size and economic impacts to determine what "multipliers" should be applied to the base damages award. The total sum is the Trust's proposed damages award.[9] As the TDP states,

> "the TDP establishes for unliquidated claims in the Case Valuation Matrix ("Matrix") . . . a schedule of five asbestos-related diseases ("Compensable Diseases"), which have presumptive medical and exposure requirements ("Medical/Exposure Criteria"), criteria for establishing liquidated values ("Matrix Values"), anticipated average values ("Average Values"), and caps on liquidated values ("Maximum Values"). The Compensable Diseases, Medical/Exposure Criteria, Matrix Values, Average Values, and Maximum Values, which are set forth in the attached Matrix, have all been selected and derived with the intention of achieving a fair allocation of the Trust funds as among claimants suffering from different disease processes in light of the best available information, considering the settlement history of Western and the rights of claimants would have in the tort system absent the bankruptcy. The TDP also provides mechanisms for the treatment and payment of Liquidated Claims." TDP, § 2.1.

---

[8] The Glossary defines "Asbestos-Related Disease Categories" as "those groups of common asbestos-related medical conditions, based upon historic data, that have been incorporated into the TDP to facilitate the expedient and efficient processing and liquidation of Asbestos Related Claims."

[9] As discussed in further detail *infra*, the Trust only pays a percentage of each damages award to ensure that it has sufficient funds to pay future claims.

In other words, the Trust Documents created a damages structure that is fundamentally driven by a claimant's *asbestos caused medical diagnosis* as of the filing of the claim.[10] Thus, despite the Joint Plan's seemingly broad definition of "Asbestos-Related Claims," the Trust Documents do not have a mechanism by which the Trust may award damages on an unliquidated claim held by someone who has not been exposed to asbestos and is not suffering from an asbestos caused disease (other than those persons who are pursuing a "survivor" claim on behalf of a deceased claimant who had been exposed).[11] While the Trust may conduct "Individual Reviews" of claims that do "not meet the presumptive Medical/Exposure Criteria for the relevant Compensable Disease,[12]" this process is reserved for claimants who do not submit sufficient evidence of exposure or injury to allow the Trust to routinely assign a Disease Category. As the Matrix explains,

> "Any Claimant or Injured Person whose claim does not meet the medical or exposure criteria for any Compensable Disease shall have the opportunity for individual consideration and evaluation of their claim. In such a case, the Trust shall deny the claim or, if the Trust is satisfied that the Injured Person has presented a claim that would be cognizable and valid in the tort system in a jurisdiction where Western has been or was, on the Petition Date, amenable to suit, the Trust can offer the Injured Person a liquidated value amount up to the average settlement value for that Compensable Disease in the appropriate jurisdiction . . . ."[13]

And while a claimant a) may reject the Trust's damages determination, b) proceed to binding or non-binding arbitration, and if the non-binding arbitration reward is still unsatisfactory, c) liquidate their claim through state court litigation, this option still does not create a gateway for the submission of a

---

[10] Given the progressive nature of asbestos afflictions, the TDP also allows claimants to file a second claim if their condition sufficiently worsened after the claimant filed their initial Trust claim (for example, if the claimant's medical diagnosis advances from asbestosis to mesothelioma or some other form of cancer. *See* TDP § 5.8(a)).

[11] As TDP § 5.3(b) notes, "The five Compensable Diseases covered by this TDP are set in detail in the Matrix . . . . The Compensable Diseases, Matrix Values, and Medical/Exposure Criteria shall apply to all unliquidated claims filed with the Trust." While the Trust does not dispute that Edward died as a result of a "Compensable Disease," he released all of his personal claims arising from his exposure. See this court's August 5, 2021 memorandum decision.

[12] *See* TDP § 2.2.

[13] *See* Matrix § VIII.

9

ORDER
Case: 20-03026    Doc# 88    Filed: 09/13/21    Entered: 09/13/21 09:56:06    Page 9 of 20

claim that is not premised on the claimant's personal exposure to asbestos. *See* TDP § 7.3.[14]

The Matrix's damages structure was the product of a substantial amount of negotiation and compromise by and between the Joint Plan's proponents. It reflects the drafters' best efforts to award reasonable damages to claimants exposed to asbestos, and it is not necessarily in lock-step with the exact damages that a claimant could receive in state court litigation. Penrod Declaration, ¶ 37 [Docket Entry # 45]. While the drafters relied on the Debtors' historical settlement values to establish the Matrix's base damage awards and its various multipliers, they also included certain types of damages in the base amounts that, in some instances, a claimant could not otherwise recover under California law (for example, awarding emotional distress damages to a deceased claimant). In addition, the Matrix does not provide for punitive damages, and to ensure that it treats liquidated and unliquidated claims equally, the Trust reduces each "pre-Petition Liquidated Claim" by the amount of the punitive damages awarded to the claimant. *See* TDP § 7.2.

The Trust's pragmatic compensation scheme also allows it to generally ignore the legal underpinnings of an unliquidated claim. An unliquidated claim's treatment is the same under the Trust regardless of whether it arose from negligent or intentional conduct, or from principles of strict liability. Moreover, while a claimant's status as "living" or "deceased" may cause the Matrix to adjust the base damages award, these adjustments are made within the confines of each Disease Category.[15] As a result, there is little use or mention of the phrase "wrongful death" or distinct treatment of "wrongful death" claims in the Trust Documents. For example, while that phrase is found in TDP § 5.8(b), this section refers to a claimant's right to file a wrongful death or Second Disease Claim if the claimant held a Pre-Trust personal injury default judgment and then died of an asbestos-related disease. Section 5.8(b) works in tandem with § 5.8(a) to allow a claimant whose

---

[14] The Disclosure Statement also states that "The claims procedures proposed for the Trust are designed to provide equivalent treatment of all *bodily* injury claims both with regard to the percentage of their claims that are paid and the timing of their payments." [emphasis added.] The phrase "bodily injury claim" is not defined in the Glossary.

[15] For example, see the adjustments made by the Matrix to mesothelioma claimants if the claimant is alive. Matrix Article II, § b.

condition worsens after their (pre-Trust) personal injury default judgment to file a claim to recover for the more serious diagnosis. Section 5.8(b) does not apply to the Dardens' wrongful death claims on its face, because Edward - the claimant - did not hold a pre-Trust personal injury default judgment. Instead, he settled and released his wrongful death claim in 1986.[16] The phrase "wrongful death claim" is also mentioned in TDP § 7.3, which addresses a claimant's right, after rejecting the results of a non-binding arbitration, to commence litigation against the Trust to establish and liquidate their claim. Section 7.3 provides in pertinent part that:

> "If a holder of a disputed claim disagrees with the Trust's determination regarding the Compensable Disease of the claim, the claimant's exposure history or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.9 above and rejected the resulting arbitration award, the holder may file a lawsuit in the jurisdiction where in personam jurisdiction over the Trust can be obtained. Any such lawsuit must be filed by the claimant in his or her own name and not as a member or representative of a class. No such lawsuit may be consolidated with any other lawsuit, with the exception of a personal injury or survival claim which may be consolidated with a wrongful death claim brought as a result of the death of the Injured Party. . . . If the claimant was alive at the earlier of the date on which the initial complaint was filed or the date the Trust Claim was filed, the case will be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim. . . ."[17]

This TDP provision is not relevant to this court's analysis, because it only applies to claimants who are suffering from some "Compensable Disease" who reject the Trust's determinations. The Dardens do not allege that they were exposed to asbestos and suffer from one of the Compensable Diseases. Instead (as discussed *infra*), their wrongful death claims fall under California Code of Civil Procedure 377.60 *et seq*. And, while the claim arising from the Trust's procedures may be

---

[16] Section 5.8(b) read as follows: **"Second Disease Default Judgment Claims**. Claimants who took personal injury defaults are allowed to file (I) a wrongful death claim, if the claimant subsequently died of an asbestos-related disease and/or (ii) a Second Disease Claim. These claims will be valued, pursuant to the Matrix, at either I) one-half (1/2) of the otherwise appropriate liquidated value of the wrongful death or Second Disease Claim award from the Trust; or (ii) at full value of the new claim, wrongful death claim or Second Disease Claim less a dollar for dollar credit on money actually received out of the Judgement Escrow and amounts paid pursuant to Section 5.4, as the claimant may elect." Despite this use of the phrase "wrongful death claim," the Matrix does not have a separate damages provision for wrongful death claims. Instead, the claimant is compensated pursuant to the applicable Disease Category.

[17] Stated differently, the Matrix awards damages to a deceased claimant that the claimant otherwise could not recover under California law.

11

consolidated with a "wrongful death claim," there is no language indicating that the Trust is liable for any damages arising from a claim that is otherwise not compensable under the Matrix. *See* TDP § 7.4.[18]

After calculating a claimant's damages award, the Trust pays the claimant only a percentage of these damages. This "Payment Percentage" provision was necessary to ensure that the Trust would a) remain solvent over its estimated several decade-fold lifetime and b) comply with Bankruptcy Code § 524(g)'s mandate to treat "similar claims in substantially the same manner." While the Trust was funded, in part, by more than a billion dollars in insurance proceeds, the Joint Plan's proponents calculated that the Trust's present and future claims would be many multiples of its trust res. The Trust retained experienced consultants who performed sophisticated analyses to determine the amount and type of future claims that would be filed during its existence. These consultants, presumably at the behest of the Joint Plan's proponents, did not include in their "future claim" calculations any potential wrongful death claims arising from otherwise settled personal injury asbestos claims - such as Edward's 1983 Alameda County Action. *See* Vasquez Declaration, ¶¶ 21, 25. Vasquez estimates that the Payment Percentage would substantially decrease if the Trust was required to consider such potential wrongful death claims.[19]

This court confirmed the Joint Plan in January 2004 after a lengthy, contested confirmation hearing. Several members of the asbestos plaintiff's bar who helped draft the Joint Plan and Trust Documents testified during that hearing, and the Trust has offered some of that testimony in support of its summary judgment motion. While the Dardens have not challenged any of this testimony, it is of limited value because the questions posed and answers given do not directly address the

---

[18] The phrase "wrongful death" is also found in § 7.5 of the TDP, which discusses the release language that the Trust could request a claimant to sign when paying a claim.

[19] The Vasquez declaration leads this court to surmise that the Trust proponents (and the present Trustees) simply assumed that the pre-Trust wrongful death releases were enforceable or made a calculated decision that it would be an overwhelming task to review each pre-Trust release and evaluate its enforceability. Regardless, the Trust's concern that it might face a tsunami of unanticipated claims is overstated and of no relevance to the cross-motions before this court. The Trust Documents authorize the Trust to recalculate the Payment Percentage as necessary.

12

fundamental issue before this court: whether the Trust must compensate holders of "independent" wrongful death claims such as those the Dardens wish to assert.

The Trust has operated since 2004 and has processed and paid more than ten thousand claims. It has rejected another seven thousand. Laura Paul, the Trust's Chief Operating Officer, has been employed by the Trust almost from its inception, and she has submitted two declarations in support of the Trust's cross-motion. In her initial declaration, Paul directs the court to various iterations of the Trust's "Claim Processing Manual" to emphasize the point that the Trust reviews each claim to determine if it has previously been paid or settled, and that the Trust has not paid "historical settled claims." She also avers that the Trust "has never paid a wrongful death claim as [a] separate claim unrelated to the personal injury or survivorship claim of the injured party."

The Dardens disagree with Paul's assessment of the Trust's operations, and offer several instances where the Trust did pay "wrongful death" claims. The Dardens first refer this court to the Garrett claim. In January 1995, Garrett and several family members signed a release with Western MacArthur similar to the one signed by Edward, with one significant difference: Garrett, who was then suffering from asbestosis, did not release "claims for subsequent asbestos-related malignancies." Garrett contracted lung cancer and died of its effects in 2002, and his attorneys filed a claim with the Trust in or about 2005 to recover damages arising from his cancer diagnosis and death. The Trust ultimately treated the cancer diagnosis as a 'Second Disease (Malignancy) Claim" under TDP § 5.8(a), slotted the claim as a "Lung Cancer" Claim under the Matrix, and paid it. The Dardens also refer the court to the Bowser claim, which the Trust paid in 2019. Bowser settled his asbestos litigation against Western MacArthur in April 1992. The scope of his 1992 release, however, is unclear. The Bowser release excludes "any potential wrongful death claims" and states further that it "in no manner affects the ability of the legal heirs, including the spouse and children . . . to bring future claims for his wrongful death arising from this accident." The release's addendum, however, allocates 20% of the settlement amount to "the potential wrongful death action of the heirs (relating to Plaintiff)." In 2019, the Trust apparently paid a "wrongful death" claim related to Bowser's asbestos exposure. The evidence submitted to the court does not state, however, whether

this claim arose from an asbestos caused malignancy (*i.e.*, something akin to a "Second Disease (Malignancy) Claim") or was a claim unattached to any Compensable Disease. The Dardens also direct this court to five releases executed, in favor of the Trust, by individuals who apparently represented the heirs of a deceased party. Again, these redacted releases provide no evidence regarding the nature of the claims filed with the Trust (*i.e*, whether they arose from an asbestos caused malignancy or otherwise).[20]

Edward was diagnosed with mesothelioma in 2016, and he submitted a claim to the Trust on June 26, 2017 to recover damages for "personal injuries and loss of consortium" due to this diagnosis (the "June 2017 Claim"). Darden died in September 2017, and Marvie Darden legally succeeded to the June 2017 Claim and continued to pursue it. The Trust rejected the June 2017 Claim in 2019. As stated above, the Dardens have not filed separate wrongful death claims with the Trust.

The Dardens commenced this adversary proceeding in May 2020 and seek declaratory relief that the Trust "must evaluate and pay decedent Eddie Darden's and Plaintiffs' Personal Injury and Wrongful Death Claims irrespective of the 1986 release." This court, in its August 5, 2021 memorandum decision, held that the Release bars Edward's personal injury claim (*i.e.*, the June 2017 Claim). As for their wrongful death claims, the Dardens allege that their wrongful death claims arise from Cal. Code Civ. Proc. § 377.60, *et seq*. While the Dardens have not filed individual wrongful death claims, the court construes their declaratory relief request as one filed in anticipation of the Trust's rejection of such claims. The Trust concedes that it would reject the Dardens' wrongful death claims.

The Trust answered the Dardens' complaint and asserted several declaratory relief counter-claims and related affirmative defenses. The Trust seeks declaratory relief that a) the June 2017 Claim is barred by claim preclusion and res judicata; b) the Dardens' wrongful death claims are

---

[20] The Dardens then ask this court to speculate how many other "wrongful death" claims were paid by the Trust. The court notes that while Paul states that the Trust erroneously paid the Garrett and Bowser claims, she does not clearly explain why the Trust's payments were mistaken.

14

preempted by the terms of the Plan, Section 524(g), the TDP and the Matrix; and c) alternatively, that the Trust holds indemnification and hold harmless rights under the Release and is entitled to a setoff or a recovery from the Dardens of any amounts paid to them. The Dardens answered the counter-claims and asserted statute of limitations, laches, and waiver affirmative defenses.

**1. The Release Does Not Cover the Dardens's Wrongful Death Claims**

The August 5, 2021 memorandum decision determined that Edward released his personal claims against Western Asbestos and Western MacArthur when he settled with Western MacArthur in 1986. The Release did not, however, affect the Dardens' individual wrongful death claims. The Dardens were adults when Edward signed the Release, and they testified that they knew little if anything about the 1983 Alameda County Action, and there is no evidence that they agreed to release any claims as part of its settlement. Nor has the Trust provided any evidence indicating that Edward was authorized to sign the Release on his spouse and children's behalf.

A wrongful death action in California is a statutory creation, and California Code of Civil Procedure § 377.60 authorizes a wrongful death action by specified persons including the decedent's spouse and children.

> "Unlike some jurisdictions wherein wrongful death actions are derivative, Code of Civil Procedure section 377.60 'creates a new cause of action in favor of the heirs as beneficiaries, based upon their own independent pecuniary injury suffered by loss of a relative, and distinct from any the deceased might have maintained had he survived. [Citations.].'
> As was stated in *San Diego Gas & Electric Co. v. Superior Court* (2007) 146 Cal.App.4th 1545, 1551 [53 Cal. Rptr. 3d 722], any wrongful death recovery "is in the form of a lump sum verdict determined according to each heir's separate interest in the decedent's life [citation], with each heir required to prove his or her own individual loss in order to share in the verdict. (§ 377.61; [citation].) Because a wrongful death action compensates an heir for his or her own independent pecuniary losses, it is one for 'personal injury to the heir.' [Citations.] Thus, in a wrongful death action the 'injury' is not the general loss of the decedent, but the particular loss of the decedent to each individual claimant." [citations omitted.] *Ruiz v. Podolosky*, 50 Cal.4th 838, 844 (2010).

The power to release a wrongful death cause of action on behalf of an heir thus belongs to the heir, not the decedent. *Eriksson v. Nunnink*, 233 Cal.App.4th 708, 724 (2015).

The Release, which only Edward signed, therefore did not terminate the Dardens' individual wrongful death claims. Accordingly, the court grants the Dardens' motion for summary judgment

15

that the Release did not terminate their wrongful death claims.

## 2. The Trust Does Not Cover the Dardens' Wrongful Death Claims

While the Dardens' wrongful death claims were not affected by the Release, they cannot be asserted against the Trust. The undisputed facts demonstrate that the Trust simply was not constructed to compensate wrongful death claims such as those created by Cal. Code Civ. Proc. § 377.60, which are untethered to any asbestos induced disease.

A confirmed Chapter 11 plan of reorganization creates a contract between the debtors and their creditors. *Hillis Motors v. Hawaii Auto Dealers' Ass'n (In re Hillis Motors)*, 997 F.2d 581, 588 (1993). Here, the Joint Plan and Trust Documents constitute that contract, which this court must interpret under California law. *In re Patel*, 621 B.R. 245, 251 (Bankr. E.D.Cal. 2020).

In contract disputes, summary judgment is appropriate if the contract or contract provision in question is unambiguous. *Whittlestone, Inc. V. Handi-Craft Co.*, 2012 U.S.Dist.LEXIS 128658, at *12-13 (N.D.Cal. Sep. 10, 2012). Whether a written contract is ambiguous is a question of law for the court. *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871 (9th Cir. 1979), *cert. denied*, 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed. 2d 407 (1979). If a contract is capable of two different reasonable interpretations, the contract is ambiguous. *Oceanside 84, Ltd. v. Fidelity Fed. Bank*, 56 Cal.App.4th 1441, 1448 (1997). The ambiguity may be apparent on the contract's face or result from the court's consideration of extrinsic evidence that is relevant to show whether the contract is reasonably susceptible of a particular meaning. *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 37-40 (1968). The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms. *Ibid*. Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the parties' intention." *Ibid*.

Collectively considered and on their face, the Joint Plan and Trust Documents harbor no ambiguity regarding whether the Trust must compensate the Dardens for their wrongful death claims. The Dardens do not allege that they were exposed (directly or indirectly) to the Debtors's asbestos products and that their damages arise from such exposure. Instead, they wish to assert unliquidated

16

wrongful death claims that entitle them to damages for their (and not Edward's) pecuniary loss. *See* Cal. Code Civ. Pro. § 377.61. Without some claim of asbestos exposure and illness created by that exposure, the Trust has no method by which to compensate the Dardens. Simply put, the Dardens' wrongful death claims do not slot into any of the Matrix's Disease Categories. Absent that, the Dardens cannot be compensated for their pecuniary losses by the Trust. While the Trust Documents do mention "wrongful death" claims in a few instances, none of these provisions apply to the Dardens. Critically, the Dardens do not point to any provision in the Trust Documents or Joint Plan that specifically states otherwise or creates a material question of fact regarding the Trust's ability to compensate them for their alleged damages. While this court has noted the Join Plan proponents' wish to provide for all "asbestos-related" claims, this language, if it stretches as far as the Dardens assert, was aspirational, as the operational documents created by the Joint Plan - the Trust Documents - exclude unliquidated claims filed by individuals who are not suffering from an asbestos induced disease (or succeed to a claim of someone who did suffer from such a disease). As § 5.3(b) of the TDP states, "The Compensable Diseases, Matrix Values, and Medical/Exposure Criteria shall apply to all unliquidated claims filed with the Trust." Given the Matrix's Disease Categories and detailed damages provisions, the above, broad language is not sufficiently probative to create a genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456 (1992).

The limited extrinsic evidence proffered by the Dardens does not demonstrate that the Joint Plan and Trust Documents are reasonably susceptible to any other meaning. The Dardens have not demonstrated that the handful of "wrongful death" claims paid by the Trust were similar to the claims they wish to assert, and this court cannot so infer.[21] To the extent that this court considers this

---

[21] The Garrett and Bowser claims are fundamentally different from the Dardens' claims. The Garrett and Bowser Superior Court releases explicitly reserved their right to assert wrongful death claims, which apparently led the Trust to determine that it could (correctly or not) at least pay the Garrett claim as a "Second Disease ("Malignancy") Claim" under TDP § 5.8. No one has explained the grounds for why the Trust paid the Bowser claim, and speculation is not grounds to deny (or grant) a summary judgment motion. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001).

17

evidence in the context of the Dardens' opposition to the Trust's cross-motion, rank speculation does not give rise to a justifiable inference or a genuine dispute of a material question of fact.

In contrast, the Trust's relevant, extrinsic evidence supports this court's interpretation of the Trust Documents. Laura Paul's statement that the Trust "never paid a wrongful death claim as [a] separate claim unrelated to the personal injury or survivorship claim of the injured party" has not been rebutted, and Robert Brayton's plan confirmation testimony, when carefully parsed, demonstrates that one of the primary goals of the TDP and the Matrix was to evaluate and pay damages on unliquidated claims held by claimants who were diagnosed with asbestos related diseases. Indeed, the historical data used by the Joint Plan's proponents to develop the Matrix consisted of the Debtors' pre-bankruptcy settlements of claims by plaintiffs who were suffering from asbestos induced diseases. No one offered any confirmation hearing testimony (or any other form of evidence) that the TDP and Matrix can assess and award damages on wrongful death claims such as those that the Dardens which to assert under California Code of Civil Procedure 377.60.

While the Dardens may protest that the Joint Plan thereby stripped them of their right to seek compensation from the Trust, the Joint Plan was confirmed more than seventeen years ago and the time to modify its terms or appeal its confirmation has long since expired. Moreover, Bankruptcy Code § 1123(b)(5) authorized the plan proponents - which included the lions of the local plaintiff's asbestos bar - to modify the rights of unsecured creditors. The Dardens also argue that their Due Process rights were denied by a plan confirmation process which did not expressly warn them that their potential wrongful death claims were at risk. Regardless of the merits of this argument (which this court expressly does not reach), the Dardens have not explained how their Due Process rights authorize this court to unilaterally modify the terms of the Trust Documents to compel payment of their wrongful death claims.

The court also rejects the Dardens' affirmative defenses to the Trust's request for declaratory relief. As stated in the August 5, 2021 memorandum decision, the limitations period found in Cal. Code Civ. Proc. § 366.2 is inapplicable, because the Trust is not seeking to collect any debt from Edward's estate. Nor have the Dardens explained how laches and waiver apply to the Trust's request

for declaratory relief regarding wrongful death claims which the Dardens have yet to file.[22]

**WHEREFORE**, the court grants the Dardens' motion for summary judgment, in part, and declares that the Release, in and of itself, does not bar their wrongful death claims. The court also grants the Trust's motion for summary judgment for declaratory relief, in part, that the Joint Plan and Trust Documents do not authorize the Trust to compensate the Dardens on the wrongful death claims they allege to hold. Accordingly, this court need not consider the Trust's requests for declaratory relief regarding its indemnity and hold harmless rights, and will dismiss them without prejudice. The court shall prepare an appropriate judgment.

**\*\*\* END OF ORDER \*\*\***

---

[22] As should be apparent, the undisputed facts recited by this court drew little from Penrod's declaration. Regardless, the Dardens' objections to ¶¶ 31, 33, and 34 of his initial declaration are overruled, as his testimony provided historical information and perspective that are an appropriate subject of expert testimony. This court overruled the Dardens' objection to ¶ 35 in the August 5, 2021 memorandum decision. To the extent that ¶ 41 seeks to offer an expert opinion, the objection is sustained, because Penrod is opining on the ethical obligations of unnamed parties. The objection to ¶ 42 is overruled, as this testimony is that of a percipient witness, not an expert witness. The court sustains the objection to the last sentence in ¶ 43, as this is just an attempt to interpret footnote 2 in *In re W. Asbestos*, 313 B.R. 832 (Bankr. N.D.Cal. 2003). The objections to paragraphs 48 and 49 are also overruled, as they are more in the nature of percipient testimony than expert opinion.

**COURT SERVICE LIST**

Recipients are ECF participants